CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
JAN 22 2008
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JAMES L. BOYD, )<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>COMMISSIONER OF SOCIAL SECURITY )<br>Defendant. ) | Civil Action No. 7:07cv00151<br><br>By: Hon. Michael F. Urbanski<br>United States Magistrate Judge |

## MEMORANDUM OPINION

Plaintiff James L. Boyd ("Boyd") brought this action for review of the Commissioner of Social Security's ("Commissioner") final decision denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383 ("Act").

The case is before the court on cross motions for summary judgment. Having reviewed the administrative record, and after briefing and oral argument, the decision of the Administrative Law Judge ("ALJ") is affirmed.

### I.

The court may neither undertake a <u>de novo</u> review of the Commissioner's decision nor reweigh the evidence of record. <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. <u>See</u> <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. <u>Smith v. Chater</u>, 99 F.3d 635, 638 (4th Cir.

1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

## II.

Boyd was born on April 11, 1956 and attended school through the seventh grade. (Administrative Record [hereinafter "R."] 126) Boyd worked as a truck driver for a number of different employers from September 1990 through July 2003. (R. 89) Boyd filed an application for DIB and SSI on May 13, 2004. (R. 64, 215) Boyd's application alleges a disability onset date of July 31, 2003 due to nerve damage to his right hand, pain in his lower back and neck, obesity, high blood pressure, high cholesterol, diabetes, asthma, chest pains, and difficulty grasping with his right hand. (R. 73) Of these impairments, only the back disorder, obesity, and right hand problems were considered to be severe by the Commissioner. (R. 17) Boyd's claim was denied initially on June 25, 2004 and upon reconsideration on August 27, 2004. (R. 15) An ALJ held an administrative hearing in this matter on March 7, 2006, (R. 244-69), and issued a decision on May 17, 2006 finding Boyd not disabled. (R. 15-25) The Appeals Council denied Smith's request for review on January 30, 2007, rendering the decision final. (R. 5-7)

Boyd argues that the ALJ's decision is not supported by substantial evidence and must be reversed because the ALJ accorded little weight to the opinion of his treating primary care physician, Dr. Goings, that Boyd could stand, walk, or sit for only two hours in an eight-hour workday. The Commissioner argues that Dr. Goings' opinion is unsupported by his medical records, and that the notes of Boyd's treating orthopedic specialist, Dr. Clare D. Weidman, also do not support a finding of disability. The Commissioner also relies on an assessment of Boyd's

2

residual functional capacity ("RFC") done by two state agency physicians indicating that Boyd can work in some capacity. (R. 189-196) After reviewing the administrative transcript, considering the briefs and oral argument, and considering the standard of review in social security disability appeals, the decision of the Commissioner is affirmed.

### III.

Understanding the treatment relationship between Dr. Goings and Boyd as well as the medical evidence of record is necessary to assess whether the decision of the ALJ is supported by substantial evidence. Dr. Goings is Boyd's primary care physician, and the first visits documented in the administrative record date back to July, August, and October, 2002. (R. 188) During this period, Dr. Goings treated Boyd for asthma and hypertension, both of which were controlled by medication. (R. 188) Boyd also complained of neck and wrist pain. (R. 188) Boyd informed Dr. Goings that "[h]e continues to have a lot of neck pain but doesn't take much for it." (R. 188) As to the wrist pain, Dr. Goings opined that Boyd "most likely has carpal tunnel syndrome right wrist." (R. 188) On August 5, 2003, Boyd was seen by Dr. Jenifer H. Zhai, a neurologist, for an electrodiagnostic study of his right hand. The study conducted by Dr. Zhai revealed "evidence of a moderate right carpal tunnel syndrome (median nerve entrapment at wrist) affecting sensory and motor components." (R. 132) Immediately following the appointment with Dr. Zhai, Boyd told Dr. Goings that "[h]e wants to see a surgeon regarding repair." (R. 187) As such, Dr. Goings referred Boyd to Dr. Weidman for a surgical consult. (R. 205)

Dr. Weidman examined Boyd on September 2, 2003. (R. 205) Dr. Weidman discussed the surgical procedure, possible complications and expected outcome at length with Boyd, and Boyd decided to go ahead with the surgery. (R. 205) Dr. Weidman expressed doubt over

3

Boyd's ability to return to his previous work driving a truck with no power steering even if the surgery was successful. (R. 205) On September 22, 2003, Dr. Weidman performed a carpal tunnel release surgery on Boyd's right hand and wrist. (R. 133-36) During a follow up visit on September 25, 2003, Boyd told Dr. Weidman that his "symptoms are improving already." (R. 204) Dr. Weidman saw Boyd twice in October, 2003 and on each visit Boyd noted significant improvement post-operatively. (R. 202-03)

In November, 2003, Boyd began to feel weakness in his legs and he scheduled an appointment with Dr. Goings. (R. 187) Boyd's legs became so weak during this visit that he was unable to remain standing at the registration window and had to be placed in a wheelchair before being examined. (R. 187) Dr. Goings immediately admitted Boyd to the emergency room and requested another consult by Dr. Zhai. (R. 147, 187) As part of an exhaustive work-up of Boyd, Dr. Zhai requested consultation by Dr. Gilliland on November 22, 2003 and an MRI of his lumbrosacral spine. (R. 141, 145-46) Dr. Gilliland diagnosed Boyd with diabetes, and Boyd was educated about diabetes and a proper diet. (R. 141) The weakness in Boyd's lower extremities was determined to be the result of his diabetes, and once his glucose level was corrected, Boyd regained strength in his legs. (R. 141) In discharging Boyd, Dr. Zhai noted that the "MRI of the lumbrosacral spine is essentially unremarkable," that his "[s]trength is 5/5 in all 4 extremities," and that Boyd "will be discharged home in stable condition." (R. 141) Dr. Zhai discharged Boyd on November 24, 2003. (R. 141)

Following this hospital visit, Dr. Goings saw Boyd on December 2, 2003. (R. 186) Dr. Goings noted that Boyd "feels better now than he did" prior to and during the hospitalization and that "the muscle weakness is improved now." (R. 186) Dr. Goings also noted that Boyd "is very overweight, has been averaging about 270 [pounds] the past few years. It will be very nice if

4

this came down to 250 [pounds] or lower. He has a huge abdominal girth." (R. 186) Dr. Goings also switched Boyd's hypertension medication because of the onset of diabetes. (R. 186) Boyd was seen by Dr. Goings on January 2, 2004 and his sugar levels were "no worse to slightly better" even though Boyd had gained two pounds. (R. 186) On February 2, 2004, Boyd's sugar level was 136 and "[h]is diary shows most to be less than 100." (R. 185) Dr. Goings noted that Boyd was "feeling fine" and that "[t]here is consideration that he might return to work." (R. 185) On April 4, 2004, Dr. Goings indicated that Boyd was not having any trouble controlling his diabetes. (R. 185) At the same time, Dr. Goings noted some hesitation as to the success of the carpal tunnel syndrome surgery as Boyd continued to complain of pain in his hand. (R. 185)

Dr. Goings' April 19, 2004 treatment note indicates that Boyd complained that he "supposedly is not recovering from his carpal tunnel syndrome surgery. Has difficulty using his fingers, gripping and pulling, etc. Says that Dr. Weidman told him to apply for disability. I am treating sugar diabetes, asthma and hypertension." (R. 184) Dr. Goings notes indicate that all three were being treated and controlled by medication. (R. 184) Boyd also reported "some generalized stiffness most arms and legs" during this visit. (R. 184) Of significance, Dr. Goings expressly deferred to Dr. Weidman's opinion as to whether Boyd's carpal tunnel syndrome would keep him from working as a truck driver. (R. 184) Dr. Goings noted as well that Boyd's hypertension "would not keep him from working." (R. 184) In short, although this note addresses the issue of Boyd's working, Dr. Goings does not state in this note that Boyd is totally disabled.

5

On June 3, 2004, Boyd was again seen by Dr. Goings, and, for the first time, Dr. Goings diagnosed spinal arthritis. (R. 184) Dr. Goings noted that Boyd complained that he "does have low backache from time to time if he has prolonged standing or sitting." (R. 184)

On July 27, 2004, Dr. Goings noted that Boyd sought a prescription for Xanax, an anxiety disorder medication, as he has been borrowing medicines from his brother. Dr. Goings' note states that Boyd "[t]hinks that he gets tight in the neck and shoulder muscles. He thinks that he has arthritis throughout his spine and in the right knee. He does not take a lot in the way of arthritis pills." (R. 183) On examination, Dr. Goings stated that Boyd "has a fairly good range of motion of the right knee but with discomfort . . . . I don't see a lot in the way of degenerative arthritis changes to knees or fingers." (R. 183)

Dr. Goings did not see Boyd again until February 7, 2005. At that time, Dr. Goings observed a "[f]air range of motion" in most joints and that Boyd "does not feel bad," save for some numbness in his left hand. (R. 213) The only course of treatment noted was that Boyd "lose weight." (R. 213) Boyd's last visit to Dr. Goings was on April 5, 2005 at which point Boyd indicated that he "has aches and pains in multiple areas but the low back has been pretty bad past several weeks." (R. 213) Dr. Goings noted "[s]pinal arthritis. Lots of other joints," (R. 213), but noted that the medications he prescribed were helpful while Boyd was taking them.

On July 9, 2005, Dr. Goings completed a medical evaluation for the Commonwealth of Virginia Department of Social Services. This evaluation indicated that Boyd was unable to work for a period greater than 90 days due to neuropathy and arthritis in both hands. (R. 211) Dr. Goings determined that Boyd had limitations in lifting objects greater than 10 pounds; bending over/stooping down/reaching for objects; manual dexterity activities; sitting for greater than one

6

hour at a time; standing for greater than one hour at a time and walking distances greater than 50 feet. (R. 212)

On January 12, 2006, Dr. Goings filled out another Physical Capacities form for Boyd. (R. 210) Dr. Goings opined that Boyd could occasionally lift/carry fifteen pounds and could frequently lift/carry ten pounds. Dr. Goings limited Boyd to standing and walking for only two hours in an eight-hour workday, and sitting for the same amount of time. (R. 210) Dr. Goings also indicated that Boyd would be restricted in pushing and/or pulling, fine manipulation, and repetitive motion with his hands. (R. 210) Further, Dr. Goings believed Boyd's pain to be genuine, that such pain would cause frequent interruptions in concentration and prevent him from focusing on tasks, and that there likely would be days when Boyd would be unable to work because of the pain. (R. 210)

## IV.

The ALJ is required to analyze every medical opinion received and determine the weight to give to such an opinion in making a disability determination. 20 C.F.R. § 404.1527(d). A treating physician's opinion is to be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) ("[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."); 20 C.F.R. § 404.1527 (d)(2); Social Security Ruling 96-2p.

The ALJ is to consider a number of factors which include whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the

7

diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. § 404.1527. A treating physician's opinion cannot be rejected absent "persuasive contrary evidence," and the ALJ must provide his reasons for giving a treating physician's opinion certain weight or explain why he discounted a physician's opinion. Mastro, 270 F.3d at 178; 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); SSR 96-2p ("the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). Here, the ALJ adequately addressed the opinion of Dr. Goings and explained why he declined to afford it controlling weight.

In determining that Boyd retained the RFC to perform some work, the ALJ relied upon the opinion of Boyd's treating orthopedic surgeon, Dr. Weidman, and the state agency reviewing physicians, but did not fully credit the opinion of Dr. Goings. (R. 22) The ALJ reasoned that Dr. Weidman "had treated [Boyd] over the long term and has longitudinally observed his response to treatment." (R. 22-23) The ALJ also found that Dr. Goings' opinion was not supported by his treatment notes. (R. 22) Instead, the ALJ relied upon the opinions of the state agency reviewing physicians who examined Boyd's medical records and "provided specific reasons for their opinions about [Boyd's] residual functional capacity showing that they were grounded in the evidence in the case record." (R. 22) Boyd, however, argues that the ALJ should have given greater weight to Dr. Goings' opinion that Boyd is disabled from all substantial gainful employment.
8

The ALJ did not afford Dr. Goings' opinion controlling weight because of its inconsistency with the overall medical record, specifically Dr. Goings' own progress notes as well as Dr. Weidman's opinion. The administrative record shows that Boyd was seen by Goings on a number of occasions between July, 2002 and April, 2005. (R. 183-88, 213) Many of the references in these medical records do not support Dr. Goings' opinion of total disability. For example, in February, 2004, Dr. Goings noted that Boyd was feeling fine and that there was "consideration that he might return to work." (R. 185) On April 19, 2004, Dr. Goings noted that he was treating Boyd for diabetes, asthma, and hypertension. (R. 184) In terms of Boyd's hypertension, Dr. Goings noted that "[t]his would not keep him from working." (R. 184) Nowhere in his notes does Dr. Goings indicate that Boyd's asthma or his diabetes would result in total disability from work, because both were well controlled by medications. (R. 213) Specifically, on April 5, 2005, Dr. Goings noted that Boyd had "[n]o breathing problems" and that Boyd was "still on Advair.[1]" (R. 213) Additionally, on February 2, 2005, Dr. Goings indicated that Boyd's diabetes was under control but that Boyd's weight gain could prove detrimental to successful control of the disease. (R. 213) Absent other evidence to show that Boyd's hypertension, diabetes, or asthma are disabling, the Court cannot credit Dr. Goings' opinion that Boyd is totally disabled from work because of these medical conditions.

Nor do Dr. Goings' records suggest that Boyd's back pain precludes him from doing any work. For example, during a visit to Dr. Goings on June 3, 2004 for follow up of his diabetes, carpal tunnel syndrome, hypertension, and asthma, Dr. Goings noted "[h]e has not been back to work since his carpal tunnel surgery and didn't sound like he was going to. He does have low backache from time to time if he has prolonged standing or sitting." (R. 184) Later, on February

---

[1] Advair is a steroid inhaler prescribed to treat asthma.

9

2, 2005, Dr. Goings noted that Boyd exhibits "[f]air range of motion [in] most joints." (R. 213) An MRI from November 22, 2003 is the only diagnostic evidence in the record as to Boyd's back, and it too does not appear to support total disability. (R. 178)

At that time, an MRI was taken of both Boyd's thoracic and lumbar spine. (R. 177-78) As interpreted by Dr. Neil F. O'Donohue, the thoracic MRI revealed no significant abnormalities. Dr. O'Donohue noted mild to moderate narrowing in the lower lumbar spine, but no evidence of disc protrusion or extrusion. Dr. O'Donohue noted a mild annular bulge with an annular tear at L5-S1, but indicated that as he understood that pain in this region was not a complaint, "this is having no apparent effect upon neural structures." (R. 178) Thus, the diagnostic evidence does not support total disability.

Boyd also suffered from carpal tunnel syndrome, but he obtained some relief from the condition after his September 22, 2003 surgery. (R. 134-140) The ALJ relied upon Dr. Weidman's opinion as to Boyd's ability to return to work following surgery to repair the carpal tunnel syndrome. (R. 22-23) Dr. Weidman followed Boyd's progress post-operatively and noted positive recovery from the surgery. (R. 197-99, 200-03). On February 5, 2004, Dr. Weidman told Boyd that he would cause further damage to his hand if he continued to use his hand as a hammer in hooking up trailers and closing doors while working as a truck driver. (R. 199) Dr. Weidman also noted that Boyd was "going to have make a decision to return to his work activities or seek other employment." (R. 199) A month later, on March 18, 2004, Dr. Weidman opined that Boyd

> could return to work activities as long as he does not have to do
> repetitive grabbing or grasping. He is not going to be able to drive
> [a] truck which does not have power steering. He could return to
> work activities driving a truck with power steering at this point and

10

>I have indicated that he should go and talk to his employer to see whether or not he has a job to return to.

(R. 198) The last time that Dr. Weidman saw Boyd was on April 15, 2004. At that time, Boyd told Dr. Weidman that he "continues to complain of discomfort in the hand from time to time with difficulty holding hammer, tools, or grasping or grabbing." (R. 197) Dr. Weidman stated that Boyd could not work as a laborer or truck driver and as to Boyd's planned application for social security disability, "he would need the support of Dr. Goings who was more aware of his medical problems than I to support this application for his disability." (R. 197) It is apparent from these records that Dr. Weidman does not consider Boyd to be totally disabled because of his carpal tunnel syndrome.

Four days later, Boyd reported to Dr. Goings that "Dr. Weidman told him to apply for disability." (R. 184) Dr. Goings noted that "I am treating sugar diabetes, asthma, and hypertension," (R. 184), but does not indicate that any of these medical conditions would support an application for disability. (R. 184) With regard to hypertension, Dr. Goings' note specifically states that "[t]his would not keep him from working." (R. 184) As to carpal tunnel, Dr. Goings expressly deferred to Dr. Weidman's opinion as to whether Boyd could return to his work as a truck driver with this condition. (R. 184) In short, there is nothing in this or the other treatment notes of Dr. Goings to support his assessment of total disability. As such, the ALJ was correct not to accord Dr. Goings' later opinion of total disability controlling weight.

Instead, the ALJ adopted the medical opinions of the state agency reviewing physicians as to Boyd's RFC, because the opinions were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record." (R. 23) Drs. Frank Johnson and Randall Hays evaluated all the medical evidence

11

in the record and opined that the records do "not document severe functional limitations that would preclude all work ability." (R. 194) Drs. Johnson and Hays found that Boyd could occasionally lift/carry twenty pounds and could frequently lift/carry ten pounds. (R. 190) They further limited Boyd to standing and walking for about six hours in an eight-hour workday, and sitting for the same amount of time. (R. 190) Drs. Johnson and Hays also indicated that Boyd would be restricted in pushing and/or pulling with his right hand pain. (R. 190) Drs. Johnson and Hays relied on the moderate findings in the November 22, 2003 MRI of Boyd's spine to show that no severe functional limitations existed as a result of his back pain. (R. 191) They also found that Boyd could return to work with some limitations as a result of the carpal tunnel release. (R. 191) Drs. Johnson and Hays also relied on Boyd's daily activities as further evidence that no severe functional limitations exist that would preclude Boyd from working. (R. 194) Specifically, Boyd's ability to "prepare meals, be primary caregiver to his 5 [year] old child during the day, ride and work on his motorcycle"[2] all supported their RFC finding for Boyd. (R. 194)

Considering the evidence in the administrative record as a whole, the court finds that the Commissioner's decision meets the substantial evidence standard. Again, it is not the province of the court to make disability determinations or to re-weigh the evidence in this case; rather, the court's role is to whether the Commissioner's decision is supported by substantial evidence. Considering that the Supreme Court has defined substantial evidence not to be a large or

---

[2]In the Daily Activities Questionnaire completed for the state agency on May 26, 2004, Boyd indicated that he spent time working on and riding a motorcycle. Boyd said that he needed help working on his motorcycle because his hand and back goes numb and he drops things. (R. 84) Boyd explained that he "used to be able to ride motorcycle for long periods now can only take short rides." (R. 85)

12

considerable amount of evidence, more than a mere scintilla and somewhat less than a preponderance, Pierce v. Underwood, 487 U.S. at 565, Richardson v. Perales, 402 U.S. at 401, it is clear that the evidence in the record in this case, manifest in the treatment notes of Drs. Goings and Weidman, the MRI results as interpreted by Dr. O'Donohue, and the state agency assessment by Drs. Johnson and Hays, meets the substantial evidence standard.

In affirming the final decision of the Commissioner, the court does not suggest that Boyd is totally free of all pain and subjective discomfort. The objective medical record simply fails to document the existence of any condition which would reasonably be expected to result in total disability from all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Boyd's claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Defendant's motion for summary judgment must be granted.

The Clerk of Court hereby is directed to send a copy of the Memorandum Opinion and accompanying Order to all counsel of record.

**ENTER:** This 22rd day of January, 2008.

/s/ Michael F. Urbanski
Michael F. Urbanski
United States Magistrate Judge